Philip J. LEVIN, Janice H. Levin, Shopcenters, Inc., Blue Star Shopping Center, Levincorp and William S. Vernon, Plaintiffs,

v.

METRO–GOLDWYN–MAYER, INC., a Delaware corporation, Robert H. O'Brien, Ira Guilden, Philip Roth, Benjamin Melniker and George L. Killion, Defendants.

No. 67 Civ. 303.

United States District Court
S. D. New York.

Feb. 10, 1967.

Murray I. Gurfein, New York City, for Philip J. Levin, Janice H. Levin, Shopcenters, Inc., Blue Star Shopping Center, Levincorp.

Abraham L. Pomerantz, New York City, for William S. Vernon. Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for Metro-Goldwyn-Mayer, Inc., Louis Nizer, New York City, of counsel.

Davis, Polk, Wardwell, Sunderland & Kiendl, New York City, for Robert H. O'Brien, Ira Guilden, Philip Roth, Benjamin Melniker and George L. Killion, S. Hazard Gillespie, New York City, of counsel.

RYAN, District Judge.

This action was filed by six stockholders [1] of Metro-Goldwyn-Mayer, Inc. (MGM), a Delaware corporation with its principal place of business in New York. The defendants named are MGM and five of the thirteen members of its Board of Directors.[2] They are part of present MGM corporate management; all of them serve as officers or as members of the Executive Committee.

Plaintiff, Philip Levin, is and has been a director of MGM since February, 1965 and all of the plaintiffs hold substantial blocks of MGM common stock.[3]

The present action flows from a conflict for corporate control between present management—called "the O'Brien group" and "the Levin group." Each group intends to nominate a slate of directors at the MGM stockholder annual meeting which is to be held on February 23, 1967; each has been actively soliciting proxies for this meeting.

The action was commenced on January 19, 1967 in the Supreme Court, County of New York, when defendants MGM and Melniker were served with the summons and complaint. Defendant Killion appeared in the action on January 24, 1967. These three defendants on the same day removed the action to this Court. No motion to remand has been made; jurisdiction of this Court has not been questioned; and diversity and federal jurisdiction appear to be pleaded in the complaint.[4] With the state court process, a state Supreme Court order to show cause was served. It is upon a similar order to show cause issued out of this court that we consider the plaintiffs' application for injunctive relief pendente lite.

Plaintiffs complain of the manner, method and means employed by defendants in the solicitation of proxies for the coming annual meeting of MGM stockholders. Specifically, plaintiffs charged that the defendants, in connection with the proxy solicitation contest, have wrongfully committed MGM to pay for the services of specially retained attorneys, a public relations firm and proxy soliciting organizations, and, in addition, have improperly used the offices and employees of MGM in proxy solicitation and the good-will and business contacts of MGM to secure support for the present management. Plaintiffs, in their complaint, pray for temporary and permanent injunctive relief [5] against defendants' continuing this method of solicitation of proxies and against defendants' voting the proxies so obtained

1. As of January 5, 1967, 5,042,859 shares of 8,000,000 shares of MGM authorized common stock were outstanding. The stock is listed and traded on the New York Stock and the Pacific Coast Exchange. There are approximately 13,000 holders of MGM common stock; they are located throughout the United States and abroad.

2. The five defendants named have been directors of MGM for many years—
   Robert H. O'Brien since 1957
   Ira Guilden since 1958
   Philip Roth since 1958
   Benjamin Melniker since 1954
   George L. Killian since 1957

3. Plaintiffs own 552,705 shares of MGM common stock, approximately 11% of the total outstanding shares, with a market value of nearly $20,000,000. Levin, one of the plaintiffs, also states by affidavit that he has other stockholders associated with him in the proxy contest who hold 127,150 shares of MGM common, with a market value of approximately $4,323,100.

4. See prayer for relief concerning solicitation of proxies and voting of proxies at the annual stockholders meetings, and allegation of plaintiffs that those soliciting proxies on behalf of defendants failed to comply with the proxy rules and regulations of the Security and Exchange Commission. See Section 14 of the Securities Exchange Act of 1934 (15 U.S.C. 78n) and Rule 14a–11 promulgated under Sections 14; Section 27 of the same Act (15 U.S.C. 78aa).

5. The injunctive relief prayed for in the complaint is as follows:
   "(a) That defendant MGM, its officers, agents, employees and attorneys, the individual defendants, and all others acting in concert with them or any of them, be permanently enjoined:
   "(i) from using employees of MGM to solicit proxies, or from otherwise

at the annual meeting. They also seek money damages of $2,500,000 on behalf of MGM from the individual defendants.

The temporary injunctive relief now sought is precisely the same injunctive relief prayed for as a final judgment in the complaint.

Although disapproving of the proxy solicitation methods of "the O'Brien group", and of certain financial and business policies applied in the conduct of corporate activities of MGM, Levin heretofore has described Robert H. O'Brien, the President and the Chief Executive Officer of MGM, as "able and dedicated." In a letter to MGM stockholders sent out in May, 1966, Levin wrote of the Directors—"I have never impugned the integrity of any of my fellow board members."

Plaintiffs' counsel during the presentation of their arguments have stated that no charge is made by plaintiffs that defendants or any of them or any one acting for them or on their behalf have made any false or fraudulent statements in their solicitation of proxies. Plaintiffs make no charge of corruption in the conduct of the corporate affairs for direct personal gain or profit by any of the defendants.[6]

Plaintiffs maintain the injunctive relief sought is required to prevent (1) the unlawful use of the corporate organization—its employees, good-will and offices and of corporate funds in the solicitation of proxies, (2) the retention of "the four top proxy-soliciting concerns and the passing of their bill for their services to the corporation rather than to the individuals" and (3) the employment at corporate expense of special counsel "for the sole and exclusive and no other purpose than the waging of a proxy contest on behalf of the individual defendants who have every right to pay for his valuable services" with their own private funds, particularly in view of the fact that regularly employed attorneys are available to represent the corporate interests of MGM.

Because of the nature of plaintiffs' allegations, we weigh the merits of this

---

engaging in the aforesaid proxy contest;

"(ii) from soliciting proxies from exhibitors, distributors, producers and other persons with whom MGM has business relations, other than by proxy solicitation material addressed to stockholders generally;

"(iii) from using exhibitors, distributors, producers and other persons with whom MGM has business relations, in the solicitation of proxies;

"(iv) from voting at the Annual Meeting of Stockholders to be held February 23, 1967, or any adjournment thereof, any proxies obtained as a result of the unlawful solicitations and activities specified herein;

"(v) from using the funds or assets of MGM in the solicitation of proxies, the payment of legal fees or of any other expenses incident to the aforesaid proxy contest, including acts in opposition to plaintiff's proxy solicitations as well as litigation appertaining thereto.

"(b) that, pending a final hearing, a temporary restraining order and preliminary injunction be issued in accordance with the above prayer;"

6. The papers before us show that the salary of Robert H. O'Brien, President and Chief Executive officer is $20,800 per annum. His salary was recently increased to $28,000 per annum when his employment was recently continued for a three-year period. In the new contract, a provision for $26,000 per year as deferred salary was omitted. It also appears that Benjamin Melniker serves as general counsel for some of the MGM divisions; his salary is $2,000 a week, he formerly was paid $1750 a week and $250 a week deferred compensation; he now is paid all his salary currently. George L. Killion serves as Chairman of the Board of Directors, for which he is paid $30,000 per annum. Ira Guilden is Chairman of the Executive Committee and Philip Roth is the Vice Chairman; between them $55,000 is paid. Although these facts are set forth in the complaint, no relief or reimbursement is sought. All of the salaries have been approved by the Board of Directors; they have been fully disclosed and do not appear to be excessive in amount in light of the services performed, the experience, and business background of the incumbents, the responsibilities they bear and the results they have achieved for MGM.

application for injunctive relief against the financial and business background of MGM. As of August 31, 1966, MGM had total assets of $251,132,000 and a gross income for its 1966 fiscal year of approximately $185,000,000. It is one of the major producers and distributors of motion pictures in the world and markets to exhibitors films produced by others as well as its own films. MGM has 31 branch distribution offices in the United States. It operates 49 theatres in foreign countries, and it licenses its feature productions and its "shorts" to local as well as network affiliated television stations. It operates a record manufacturing plant, pressing records for its own labels and for others and it produces and distributes records for itself and others. It also has a majority stockholding in one of the leading music publishing companies. MGM's gross revenue in the past fiscal year from music publishing and record distribution are stated to have been over $30,000,000. MGM owns and operates a motion picture producing studio in California and another in England, where feature films are produced by it, often involving expenditure of eight to ten million dollars on a single production. MGM is one of the "giants" in the entertainment industry.

■ Much has been said by the defendants of the need for expert knowledge in the entertainment field, in the specialized demands for financing, and in the management of an enterprise of the magnitude and diversity of MGM. This is undoubtedly required. Defendants point with unabashed pride to the results they have achieved in their direction of the affairs of MGM. We do not question that the successful operation of MGM has been accomplished in no small measure by diligent and intelligent application to corporate affairs and by the exercise of sound and informed business judgment. The decision as to the continuance of the present management, however, rests entirely with the stockholders. A court may not override or dictate on a matter of this nature to stockholders. When we speak of stockholders, we have especially in mind the large number of stockholders who are not firmly committed to or aligned with either of the two contesting groups; majority voting power is vested in them. It is the concern of the law and of the Court that they be fully and truthfully informed as to the merits of the contentions of those soliciting their proxy. It is equally important that the Court should not unnecessarily exercise its injunctive power in such matters lest such judicial action operate to unduly influence a stockholder's decision as to which faction should receive his proxy.

■■ It is quite plain that the differences between "the O'Brien group" and "the Levin group" are much more than mere personality conflicts. These might readily be resolved by reasoning and hard-headed, profit-minded business men. There are definite business policies advocated by each group, so divergent that reconciliation does not seem possible. They appear so evident from the papers before us that detailed analysis would be a waste of time.[7] However,

7. The fundamental policy differences between the contesting groups concern, among other matters:
　　a. The annual number of feature pictures MGM should produce; management policy would limit them to approximately 25 top productions (with cost per picture from $5,000,000 to $8,000,000) and the balance costing down to approximately $500,000; "the Levin group" policy advocates up to 50 top productions a year.
　　b. "The Levin" policy would provide for a slow release of pictures to TV showing; management would license to TV pictures of more recent release date.
　　c. Management and the independent accountants in setting rate of amortization of production costs have allocated part to later television licenses; Levin group would apply all of amortization to exhibitor or screen showings and at an earlier date than now used.
　　d. Levin policy would build up cash funds available for productions by reducing dividends, and thus reduce ne-

in such a situation the right of an independent stockholder to be fully informed is of supreme importance. The controlling question presented on this application is whether illegal or unfair means of communication, such as demand judicial intervention, are being employed by the present management. We find that they are not and conclude that the injunctive relief now sought should be denied.

The proxy statement filed by MGM under date of January 6, 1967, opens with the statement that "MGM will bear all cost in connection with the management solicitation of proxies." It discloses the purpose of the management to solicit proxies and "to request brokerage houses, custodians, nominees and others who hold stock in their names to solicit proxies from the persons who own such stock, pursuant to the rules of the New York Stock Exchange." It sets forth that MGM will reimburse them "for their out-of-pocket expenses and reasonable clerical expenses." It discloses the employment of Georgeson & Co. at $15,-000 and Kissel-Blake Organization, Inc. at $5,000 for services and estimated out-of-pocket expenses. It informs the reader that "officers and regular employees of MGM and its subsidiaries" may request the return of proxies for which no additional compensation will be paid them. It advises that "Proxies may also be solicited in newspapers, or other publications" and that the total amount which it is estimated will be spent in the management solicitation is $125,000 "exclusive of amounts normally expended for a solicitation for an election of directors and costs represented by salaries and wages of regular employees and officers."

We do not find the amounts recited to be paid excessive, or the method of

operation disclosed by MGM management to be unfair or illegal. It contravenes no federal statute or S.E.C. rule or regulation. It provides for orderly dissemination of information to the public investors and the methods and procedures outlined in the management proxy statement follow those set forth in "the Levin group" proxy statement issued under the auspices of "MGM Stockholder's Committee for Better Management." This "Levin group" statement discloses that R. A. Drennan & Co., Inc. has been hired at a fee (and reimbursement of expenses) not to exceed $17,000; that as of January 19, 1967 approximately $35,000 had been expended by the "Committee" and that it is estimated that the total expenditures for solicitation will amount to approximately $175,-000; "all expenses will be paid by Philip J. Levin, his wife and corporations wholly owned by them." It is however noted that "no decision has yet been made as to whether reimbursement will be requested from the Company. However, if reimbursement from the Company is sought, it will be submitted to a vote of the stockholders."

We will next consider the other activities that plaintiffs would enjoin:

1. The use of corporate employees for proxy solicitation.

■ It is represented in defendants' affidavits that the use of MGM employees for proxy solicitation has been "extremely limited and moderate" and that "it is identical with the procedure we have followed at MGM for the past 15 years, even though no actual contest existed except in 1957 and this past year's special meeting." No statement has come from the plaintiffs to contradict this. Contrary to plaintiffs' unsupported statement that 9000 MGM em-

cessity for financing; present management policy is different.

e. Key personnel is presently engaged under 2 or 3 year contracts; Levin policy would make these agreements only for a year.

f. Management favors preemptive right to stockholders for general pub-

lic cash offerings only; Levin policy would apply preemptive rights to all convertible offerings, options and private sale of stock.

g. Levin policy would support cumulative voting, which management opposes.

ployees are at work soliciting proxies, defendants have stated that the total number of employees who on their own time have consented to telephone shareholders to vote is less than 150. We do not find this an unreasonable situation under the circumstances. We are not informed as to whether these employees are themselves stockholders, but certainly a relationship of loyalty and friendly support between employees and management in a large corporation is not to be discouraged when viewed from a stockholder's point of view and absent even a suggestion of internal corrupt management.

■ Defendants state that following a custom of years standing the 31 branch managers in the United States and of the Canadian head office have received from management a letter requesting their aid in soliciting proxies. These letters conveyed copies of annual reports and information heretofore sent to stockholders. Plaintiffs have described the communications as "kits". We assume that they did contain pertinent information to inform the recipients of corporate factual history. No claim is made that there were threats of reprisal against the employees for failure to solicit proxies or that any such steps were taken, or that the "kits" contained false or misleading statements, with the intention they be repeated to stockholders to deceive or mislead. We find nothing inherently wrong or illegal in this procedure, nor can we say on the record before us that it is unreasonable or overreaching by management which should be enjoined.

■ 2. MGM's use of more than one proxy solicitation concern upon the ground that a single firm is adequate for the purpose of getting material into the hands of stockholders.

■ The employment of two proxy solicitation firms and the fees agreed to be paid to them were fully disclosed in the MGM proxy statement. Georgeson & Co. is in charge of solicitation of proxies from stockholders directly; the Kissel-Blake Organization is directing

its efforts to brokerage solicitation. Here again, defendants state without contradiction that "in every year since 1956, MGM has employed the firms of Georgeson & Co. and The Kissel-Blake Organization, Inc. to solicit proxies for its stockholders meetings." We do not find basis for injunctive relief in their employment, nor in the employment of Dudley King & Co. as a consultant in connection with corporate matters and stockholder relations. Of course, this Court may not forbid an independent supporter of management (Harry Brandt, who is not a party to this action) from engaging another proxy solicitation firm on his own responsibility.

3. The use of persons in business relationships with MGM in the solicitation of proxies for management, as a violation of the Securities Exchange Act of 1934.

■ There have been set forth in paid advertisements statements by actors, directors, writers and exhibitors supporting and expressing confidence in the present management. Defendants state these expressions have been unsolicited and spontaneous and have been published by these persons [and] * * paid for completely out of their own pockets without any direct or indirect promise of repayment by MGM." There is no proof to challenge this. Certainly, the defendants should not be expected to deny or contradict what they regard as well-deserved compliments graciously paid to them. Nor do we find the publication of such unsolicited individual advertisements a violation of the Act of 1934.

4. The further employment by MGM of a public relations firm.

■ It is undisputed that by contract entered into on April 28, 1966 and subject to a 30-day cancellation clause, MGM engaged the services of Thomas J. Deegan Company, Inc. Deegan is a recognized and reputable public relations firm. The engagement was long before the present proxy contest. The employment is neither unusual nor unreasonable. It

**804**

does not afford ground for injunctive relief.

5. The employment out of corporate funds of the firm of Mr. Louis Nizer and his proxy associates.

The affidavits before us establish that the Nizer law firm for many years have been retained by MGM to handle a number of litigated matters. The competency of the firm and of Mr. Nizer is not questioned; their employment was justified in management's opinion; the importance of the matter to stockholders indicates the reasonableness of their engagement; the expense and fees charged may be objected to if believed to be excessive in amount. This engagement of counsel affords no support for injunctive relief.

The plaintiffs have failed to establish their right to the relief sought and there has been no showing of irreparable harm.

Motion denied.